(C. D. 74)

## F. W. Woolworth Co. *v.* United States

United States Customs Court, First Division

(Decided January 6, 1939)

*Sharretts & Hillis* (*Arthur L. Tallman* of counsel) for the plaintiff.
*Charles D. Lawrence*, Acting Assistant Attorney General (*John J. McDermott*, special attorney), for the defendant.

Before McClelland, Sullivan, and Brown, Judges; McClelland, P. J., not participating

Sullivan, Judge: These protests are directed against the decisions of the collector of customs at the port of Philadelphia—

assessing duty at 70% under Par. 1513 on Opera glasses, etc., covered by entries named below. The reasons for objection under the Tariff Act of 1930 are that said merchandise is not chiefly used for the amusement of children and is properly dutiable at 35% under Par. 228, by virtue of the Trade Agreement between the United States and France of June 15, 1936.

The trade agreement with France above referred to is set forth in T. D. 48316. The following is a quotation from said trade agreement:

228 (b) Opera or field glasses (not prism binoculars), frames and mountings therefor, and parts of any of the foregoing; all of the foregoing, finished or unfinished, not specially provided for, 35% ad val.

**1**

The importations in question were entered in the year 1937 after the foregoing trade agreement became effective.

The merchandise in question is represented by Exhibits 1, 2, and 3. They consist of small-sized opera glasses of cheap construction with but slight magnifying power. They have the usual thumbscrew arrangement for the purpose of focusing the lenses on the object viewed.

Inasmuch as this merchandise was classified by the collector as toys or articles chiefly used for the amusement of children, the onus is on the plaintiff to overcome this presumption by a preponderance of evidence establishing that this merchandise is *chiefly* used for other purposes than the amusement of children. It will therefore be necessary to set out in detail such of the testimony as relates to the use of this merchandise.

Plaintiff's witness Beineix: Referring to items 1000/4442, and 1000/4443, represented by Exhibits 1 and 2, he testified he used them in his home as follows:

My home is on Shore Road, facing the Narrows; and the large steamers come up and down the river there. I often use one of these to read the names of the steamers. It is brought out very clearly.

Q. Did you find that you could read the name of the steamer through the use of one of these, where you could not with your naked eye?—A. Yes, sir.

Q. Approximately how many times have you used it?—A. I would say about 25 times.

\* \* \* \* \* \* \*

Q. In using articles like Exhibits 1 and 2 did you find that they aided vision?—A. It brought the article closer and clearer.

On cross-examination he testified he first used these articles about two months ago (February 1938); that the steamships referred to passed his home at a distance of about 300 feet; that he could not read the names of the steamers with his naked eye at that distance. He then testified as follows:

X Q. You are trying to convince the court that it is impossible to see the letters on an ocean liner at a distance of 100 yards with the naked eye.—A. I don't know.

X Q. Have you ever tried it?—A. No.

He further testified on cross-examination that he had observed the use of Exhibits 1 and 2 only by the members of his family, consisting of his wife and son, aged fifteen years, and that those were the only people, in addition to himself, whom he had observed using these glasses.

On redirect examination he qualified his estimate of 300 feet being the distance separating him from passing steamships, by testifying that 300 feet was the distance from his home to the shore line, and that the steamers were "out from the edge of the stream" "some-

times in the center, sometimes close to the shore side I am on, and sometimes close to Staten Island," and that his estimate of 300 feet was a guess.

Plaintiff's witness Miller: He is an optometrist. He testified he is familiar with the purpose of opera or field glasses, which is "to enlarge a distant object, to make it more readily discernible"; that they are an eye aid, and are "a combination of lenses to produce the effect of enlarging a distant object"; that "the usual opera glass may be a magnification of anything from 2 to 3½ diameters." The witness examined Exhibits 1 and 2, and testified he made tests on a similar article, which was given to him by Mr. Beineix. This article is in evidence as Exhibit 3. It is very similar in appearance and size to Exhibits 1 and 2, and was from the same shipment. It is item 1000/4442, or the same item number as Exhibit 1.

Plaintiff's witness Miller testified he made tests of Exhibit 3 as follows:

I took the lenses apart. I measured the focal power of the lenses, the objective having a power of 7½ diopters. I measured the eye-piece lens, and that is 14 diopters, 2¾ inch. I found the glass has a magnification of more than two diameters. * * * I will say that it is an opera glass.

The witness testified he had seen articles like Exhibits 1, 2, and 3 used as follows:

My father supplied these glasses to the theatres throughout the city years ago. They used to have them at the back of the seats. You dropped ten cents in and got those glasses. We sold many thousands of them. They were two power.

On cross-examination he testified that the opera glasses handled by his firm were "almost a duplicate" of Exhibits 1 and 2 in size and magnifying power, but "the quality may have been a little better than this. This part (indicating) is really enameled, but as far as the power and size are concerned they are almost identical."

Plaintiff's witness Opasser: He testified he had used articles like Exhibits 1 and 2 at ball games and theatres "at least 15 times"; that they aided his vision by bringing "the object up closer"; that he had never seen children playing with articles like Exhibits 1 and 2.

On cross-examination he testified he first saw articles like Exhibits 1 and 2 when he bought a pair a year ago.

Plaintiff's witness Mrs. Gottschalk: She testified she had used articles like Exhibits 1 and 2 at the Imperial Theatre; that their use aided her vision; that "I wanted to see more clearly, and they brought things clear to me"; that she had seen others use articles like Exhibits 1 and 2 "at the show"; that the people she saw using them were adults; that she had never seen children under the age of fourteen playing with articles like Exhibits 1 and 2.

On cross-examination she testified she had used articles like Exhibits 1 and 2 "just once" at the Imperial Theatre last month (March 1938);

that her husband used "the same thing" that she had; that others were in the balcony using articles that "looked exactly the same" as Exhibits 1 and 2; that she had never seen articles like Exhibits 1 and 2 used on other occasions.

Plaintiff's witness Daugherty testified he had used articles like Exhibits 1 and 2 at baseball games "probably a couple of dozen times"; that he had also used them on vacation trips for sightseeing; that he found the use of an article like Exhibits 1 and 2 aided his vision; that "it brings the object closer to you, like at the ball game"; that he had observed others use articles like Exhibits 1 and 2 at ball games; that their approximate ages were "over twenty-five"; that he had never seen children under the age of fourteen playing with articles like Exhibits 1 and 2.

On cross-examination he testified he had used articles like Exhibits 1 and 2 for two or three years; that he has had them in his home for two years; that such articles were "identically the same" as Exhibits 1 and 2; that he had seen five or six children under the age of twelve or fourteen *using* articles like Exhibits 1 and 2.

On redirect examination he testified such children "were with me at the games" and were using articles like Exhibits 1 and 2 to watch the games.

Plaintiff's witness Lillian Wasnick testified she had used articles like Exhibits 1 and 2 in Woolworth's store where she was employed; that she had observed other people using them "in the store, and at the hockey games, at Madison Square Garden, and at the circus"; that the approximate ages of the persons using them were sixteen or seventeen or older; that she had never observed children under the age of fourteen playing with them.

On cross-examination she testified she first saw articles like Exhibits 1 and 2 in the store "about a year and four months ago, that I am working there"; that she personally sold them.

Plaintiff's witness Rada's testimony was similar. Her use of these articles was "on boat rides," and "when I go on hikes, and at baseball games" and "for viewing scenery."

Plaintiff's witness Heymann's testimony was along the same lines. She had used articles like Exhibits 1 and 2 "at the opera, or at Madison Square Garden, or at ball games" about six or seven times over a period of a year; that she used them "to see the play more clearly."

Defendant's witness Mrs. Rankin testified she is a "mother and housewife" with three children of sixteen, eleven, and nine; that her second boy, then nine years of age, was given an article like Exhibits 1 and 2 "for Christmas, about two years ago"; that she had seen the neighborhood children using them; that she had used "the little pair that my boy had. *They do magnify some*"; that she took them once

to a boat race "but we couldn't distinguish the boat. The boat had numbers on it, but we couldn't distinguish the numbers"; that she "was unable to distinguish the boats by the numbers, to find out which was my boy's boat"; that at that time she was "approximately half a mile" from the boats, of which there were about twelve in the race.

On cross-examination she testified the boats in that race were Comet sailboats; that their sails were "26-foot sails, and the numbers would be about a foot."

An adjournment was taken for the purpose of enabling the Government to inquire whether any testimony could be obtained in Philadelphia. On the return day counsel for the Government reported that inquiry had been made, and a letter received from Philadelphia "stating they had no testimony at that port." The protest was submitted with time to both sides for briefs. Plaintiff has filed a brief. The defendant has not.

We are satisfied from the weight of the testimony and our examination of the samples that these articles are not toys, and that they are classifiable under the *eo nomine* provision for opera glasses in paragraph 228 (b).

It will be observed that the rate of duty on opera glasses as provided in paragraph 228 (b) is 45 per centum ad valorem; that these are importations from *Japan*, yet plaintiff claims that they are properly dutiable at but 35 per centum ad valorem under paragraph 228 by virtue of the trade agreement with *France* heretofore mentioned.

Plaintiff has not offered any reason or authority for its claim that these opera glasses from Japan are subject to a lower rate of duty than 45 per centum, viz, 35 per centum, as are the opera glasses covered by the French Trade Agreement. Nor has the Government raised any opposition to this claim either at the trial or by brief. Its entire contention appears to be that these articles are classifiable (as held by the collector) as toys, and the weight of the evidence is against this contention.

However, on examining the President's proclamation, as set forth in T. D. 48316, *supra*, we find quoted therein a letter from the President to the Secretary of the Treasury dated May 16, 1936. The following are extracts therefrom:

My dear Mr. Secretary:

The Act to amend the Tariff Act of 1930, approved June 12, 1934, provides in part that the duties proclaimed under its authority shall be applied to articles the growth, produce, or manufacture of all foreign countries, whether imported directly or indirectly. The Act further provides that the President may suspend the application of the proclaimed duties to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in the Act. Pursuant to these provisions of the Act, I hereby direct that the duties proclaimed on this date in connection with the trade agree-

ments signed on April 24, 1936, with Guatemala and on May 6, 1936, with France, and all other duties heretofore proclaimed in connection with trade agreements concluded under the authority of the Act (with the exception of the duties proclaimed in connection with the trade agreement signed on August 24, 1934, with Cuba) shall be applied from the effective dates of such duties or, as the case may be, shall continue to be applied on and from the date of this letter, only to articles the growth, produce, or manufacture of the countries hereinafter designated * * *.

\*    \*    \*    \*    \*    \*    \*

Japanese Empire and mandated territories and Kwantung Leased Territory.

\*    \*    \*    \*    \*    \*    \*

It is therefore evident Japan became a recipient of the advantages of this trade agreement with France.

By reason thereof we hold that the opera glasses in question are properly dutiable as claimed under the *eo nomine* provision in paragraph 228 of said act for opera glasses, at the reduced rate of 35 per centum ad valorem by virtue of the trade agreement with France of June 15, 1936, and the President's proclamation set forth in T. D. 48316, *supra*, extending the privileges of said trade agreement to Japan and other countries mentioned therein.

The protests are sustained to this extent insofar as they cover the opera glasses represented by Exhibits 1 and 2 herein. They are overruled in all other respects.

Judgment accordingly.